OPINION OF THE COURT
Saxe, J.
The impact of a building-wide renovation and upgrade on the rights of an incoming commercial tenant is the subject of this appeal. Whatever regrets the tenant may have had later about the wisdom of agreeing to a tenancy of seventh-floor premises in a building whose only elevator was then out of service due to substantial renovations should not form a predicate for judicial solicitude, in the face of a commercial lease that delineates the rights and obligations of both landlord and tenant and provides only limited protection of the tenant’s interests in the event of a long delay in the completion of the ongoing elevator renovation.
On September 5, 2006, plaintiff tenant and defendant landlord entered into a commercial lease for the seventh-floor premises *170 at 247 West 36th Street in Manhattan, to be used “for silk garment fabric sales.” The building is serviced by a single elevator, which opens directly onto the premises; the only other means of access to the premises is through a stairwell. At the time the lease was executed, the elevator was in the midst of a major renovation that had begun in July 2006, leaving the building without elevator service.
The parties’ agreement was comprised of a standard lease form, a rider, and an attached work letter. It provided for a one-year term from October 1, 2006 through September 30, 2007, with options to renew for five additional years. The parties acknowledged the possibility that the elevator would not be in service by the lease’s commencement date of October 1, 2006, in rider paragraph 41.02, which provided that “in the event the elevator installation is not completed by October 15, 2006, the Commencement Date [of] the lease shall be adjusted to October 15, 2006.” According to the landlord’s principal, Shrage Rokosz, at the time the lease was executed both parties expected that the work would be completed by October 15, 2006. In fact, however, the work was not completed and the elevator not functioning until December 4, 2006.
The work letter attached to the lease rider required the landlord to perform certain repairs to the premises, including the installation of new hardwood flooring that the tenant would provide; it expressly provided that
“[notwithstanding anything to the contrary contained herein, any items in the Lease or in this work letter that require Landlord to do work, the in-completion of any item same [sic] shall not toll the Commencement Date and Tenant shall pay the entire Annual Rental Rate and additional rent without any offsets or abatement on the Commencement Date.”
As agreed in the work letter, the tenant had hardwood flooring materials delivered to the premises in early November 2006. Rokosz testified that when he had the old flooring removed in preparation for installation of the new flooring, he saw that the subflooring in place was running in the same direction as the tenant wanted the new floor to be installed, and he advised the tenant’s principal, Joseph Ricci, that the floor would be stronger if the subfloor ran in a different direction. Ricci instructed Rokosz to hold off on installing the provided flooring, and plywood for new subflooring was subsequently delivered on December 13, 2006.
*171 At the time the lease was executed on September 5, 2006, the tenant paid the first month’s rent of $7,500 and a security deposit in the amount of $22,500. However, no further rent payments were made by the tenant after that initial payment. On December 18, 2006, the landlord sent a letter denominated a “Notice of Termination,” demanding that the tenant vacate the premises by December 27, 2006 for nonpayment of rent, and demanded that the tenant pay the rent arrears. The tenant responded by letter dated December 27, 2006, claiming that possession had never been delivered to it due to the lack of elevator service until December 4, 2006. In addition, the tenant claimed that the lack of elevator service would constitute a constructive eviction if it had been in possession, and that therefore no rent was due and there existed no legitimate basis for landlord to terminate the lease. It nevertheless agreed to surrender the premises, but demanded return of its security deposit and first month’s rent, since it considered the lease to have been cancelled.
By letter dated January 3, 2007, the landlord pointed out that the tenant had been aware that the elevator was out of service when it entered into the lease. The landlord also stated that, even though the tenant had complied with the demand that it surrender possession of the premises, it was not relieved of its obligation to pay the rent, and informed the tenant that it would not return the security deposit and first month’s rent and would hold the tenant liable for all rent due under the lease as it accrued. This action followed.
At trial, only two witnesses were offered by the tenant. The first was an attorney, who established that in response to the landlord’s December 18, 2006 letter terminating the tenancy, the tenant sent the letter dated December 27, 2006. The second witness was an employee of the elevator company that installed the upgraded elevator in the building, who testified about when the work began and said that it was completed and a certificate for its use obtained on December 4, 2006. Essentially, the tenant’s case consisted of proof that the elevator was not in service until December 4th and the contention that this constituted a constructive eviction. The landlord offered the testimony of its principal, Rokosz, who testified as to the parties’ lease negotiations and subsequent events.
The trial court found that the tenant was constructively evicted from the leased premises, based on the landlord’s failure to provide elevator service for the first seven weeks of the lease *172 term. It also held, although no such cause of action was pleaded or sought in the context of conforming the pleadings to the proof, that the tenant was subjected to actual partial eviction due to the denial of access to a necessary appurtenance, namely, the elevator as a means of ingress and egress. Further, notwithstanding the rule that once the conditions creating a constructive eviction no longer exist a tenant in possession may not rely on those conditions to avoid its lease obligations, the trial court concluded that the tenant had not been given possession of the premises within a reasonable time and that therefore its obligation to pay rent never arose. It awarded the tenant the return of its security deposit and first month’s rent.
Based on our review of the trial record, the parties’ written contract and their undisputed conduct, we find insufficient support for the trial court’s findings and conclusions, and, accordingly, we reverse. In our view, while it is true that the renovation of the building’s elevator was incomplete on the lease’s delayed commencement date of October 15, 2006, and remained so until December 4, 2006, that circumstance did not justify treating the lease as cancelled and relieving the tenant of all its obligations under the lease.
To establish constructive eviction, a tenant need not prove physical expulsion, but must prove wrongful acts by the landlord that “substantially and materially deprive the tenant of the beneficial use and enjoyment of the premises” (see Barash v Pennsylvania Term. Real Estate Corp., 26 NY2d 77, 83 [1970]). Partial actual eviction requires that the tenant be physically prevented from using a portion of the leased premises (id.). For the reasons that follow, neither claim was made out here.
The tenant presented nothing to establish that elevator service was necessary for it to operate its business during that time period; indeed, no one testified as to exactly what the operation of the business entailed or when the tenant had expected to open for business. The trial court seems to have extrapolated from the description of the business as “for silk garment fabric sales” that the tenant had intended to use the premises as a showroom from which to sell silk garment fabric to customers and that for its successful operation the business required personal visits by potential customers who would not visit a seventh-floor showroom without an elevator; it also seems to have assumed that the tenant had intended to proceed with such operations immediately upon the commencement of the lease term and before its floor was installed. All this may have *173 been true, but no evidentiary showing established these assumptions as facts or permitted their inference. Nor was there any evidence that the tenant lost any expected sales, revenue or customers.
In addition, although the tenant argues that the lack of an elevator necessarily made the premises unusable with respect to freight, furniture, business equipment, merchandise and bulky materials, it offered no evidence of items it was unable to convey to its premises and the way in which any such inability prevented it from proceeding with its operations. It is also worth noting that according to Rokosz’s unchallenged testimony, the tenant one floor below had successfully moved in by December 4, 2006.
The tenant therefore failed to establish that the lack of elevator service actually caused it to be deprived of the expected and intended use of the premises during that period, as is required for constructive eviction (see Barash, 26 NY2d at 83). We similarly find insufficient support for the trial court’s conclusion that the tenant experienced actual partial eviction based on the physical inability to obtain ingress and egress to the premises through the elevator.
The trial court correctly observed that the right to use an expected and usual means of ingress and egress is an appurtenance, the denial of which may constitute a partial actual eviction.
“If the use of the elevator by the tenant is reasonably necessary and essential to the beneficial enjoyment of the demised premises then the tenant is entitled to the continued use thereof in the manner in which it has heretofore used it, and any interference therewith or disturbance thereof constitutes an actual partial eviction” {Broadway-Spring St. Corp. v Berens Export Corp., 12 Misc 2d 460, 465 [1958]).
Although we recognize that the availability of an elevator for access to a seventh-floor place of business seems important, perhaps critical, our own view that the lack of a working elevator would constitute a substantial or total interference with access cannot substitute for an evidentiary showing by the tenant that it was actually unable to access the premises as it needed to during that seven-week period.
We also disagree with the trial court’s holding that the tenant was entitled to rescission of the lease under Real Prop *174 erty Law § 223-a. That statute gives tenants the right to rescind a lease and to recover the consideration paid when the landlord fails to deliver possession at the start of the lease term, unless the lease in question contains an express term to the contrary. Even though the lease in question here does contain an express term to the contrary, rendering the statutory right to rescind inapplicable, the trial court, relying on Hartwig v 6465 Realty Co. (67 Misc 2d 450 [1971]), reasoned that since the law “en-grafts a rule of reason upon such clauses in order that they do not, contrary to the intention of the parties, become arbitrary and unreasonable” (id. at 450-451), if the possession of the premises is not delivered within a reasonable time, then the lease term precluding application of the statutory right to rescission will become inoperative. The trial court concluded that the landlord’s delay in delivering possession, i.e., nine weeks after the lease’s original commencement date and seven weeks after the extended commencement date, was unreasonable, so it applied the statutory right to rescind.
We conclude, to the contrary, that the inclusion in the lease of an express term declaring Real Property Law § 223-a to be inapplicable takes the lease out of the statute’s purview. While the additional protection employed in Hartwig may be applicable in appropriate circumstances, such circumstances are not presented here. The present matter, unlike Hartwig, does not concern a residential tenant; while residential tenants require protection from nonnegotiable form leases containing terms that deprive them of statutory rights, commercial tenants, such as plaintiff, that are able to negotiate the terms of their leases require no such protection.
Furthermore, based upon the limited evidence plaintiff presented, we see insufficient basis for the finding that possession of the premises was not delivered within a reasonable time. What is reasonable is always dependent upon the particular circumstances (Sohayegh v Oberlander, 155 AD2d 436 [1989]). The trial court found that the situation here was unreasonable by calculating the delay as nine weeks and reframing that as one sixth of the one-year lease term; it then analogized the situation to a case in which a residential tenant was granted rescission of a three-year apartment lease and the return of his prepayments, after he was subjected to a five-month delay in the availability of the apartment (citing Rein v Metrik Co., Inc., 200 Misc 231 [1951]). However, the cases are not comparable, and the present situation was somewhat distorted in the comparison.
*175 While there was, unquestionably, a seven-week delay in the availability of elevator service (calculating from the agreed-on delayed lease commencement date), the evidence fails to establish that plaintiff was deprived of any expected use of the premises during that period. On the contrary, it appears that the tenant was given—and took—the degree of possession of the property that was contemplated when the lease was signed.
First, the delivery and acceptance of the key to the premises establishes that the tenant was initially given the contemplated access. Although the elevator was not operational, the undisputed testimony of Rokosz, the landlord’s principal, establishes that Ricci, the tenant’s principal, and the tenant’s employees and contractors, could, and did, gain access to the leased premises from the stairway. Indeed, Rokosz testified that all the other tenants of the building moved in before December 4th, using only the stairs for access. Ricci also physically accepted delivery of the elevator key on December 4th, which reflects that the tenant did not, at that time, take the position that the lease was a nullity due to a failure to deliver possession before then.
Second, the tenant’s acts of delivering hardwood flooring to the premises in early November 2006 in accordance with the work letter accompanying the lease and instructing Rokosz to hold off on its installation in view of the subflooring concerns, and then having plywood delivered in December 2006, further reflect that the tenant actively cooperated in the process of readying the place for the contemplated future business operations. Under such circumstances, it is inaccurate to say that the tenant was not given the possession contemplated by the lease.
The trial court further reasoned that rent was not payable for the period between October 15, 2006 and December 4, 2006, based on the lease and on the undisputed testimony of the landlord’s principal that at the time the parties executed the lease, they both knew that installation of the new elevator was not yet complete, and “expected” that the elevator would be ready by October 15th. The trial court found that it was both parties’ understanding and intention that rent would not be payable if the elevator was not in service by that date. One ground for this conclusion was that, according to the trial court, the lease “contain[ed] no express provision governing the situation” that the elevator installation would not be completed by October 15, 2006. However, the opposite is true. Rider paragraph 41.02 explicitly contemplated the possibility that the elevator *176 installation would not be completed by October 15th, in providing that “in the event the elevator installation is not completed by October 15, 2006, the Commencement Date [of] the lease shall be adjusted to October 15, 2006” (emphasis added). The very language of the provision acknowledged the possibility that the elevator installation would not be completed by October 15, 2006. While it provided only that in such circumstances the lease commencement date would be postponed two weeks, from October 1st to October 15th, that is not the same as neglecting to consider or make any provision for the possibility. Absent any further provision protecting the tenant beyond the two-week delay of the commencement of the lease term, the lease must be understood to provide that the tenant’s obligations thereunder, including the obligations to pay rent and to notify the landlord of any claimed default, began as of October 15, 2006, regardless of the lack of elevator service.
The trial court also reasoned that based on Rokosz’s testimony that there was no talk of rent being due and payable when he met with Ricci, on November 10, 2006, it could be inferred that Rokosz’s understanding at that time was that, since the elevator was not working yet, the tenant’s obligation to pay rent had not been triggered. However, that inference is improper, since, due to the delay of the lease commencement date to October 15, 2006, as of November 10, 2006, the next payment of rent would not yet have been due.
As to the part of paragraph 24 of the standard form portion of the lease entitled “Failure to Give Possession,” which provides for a rent abatement in the event the landlord’s failure to complete contemplated work prevents the landlord from giving possession of the premises to the tenant, we perceive, for the reasons stated above, insufficient support for a finding that the landlord failed to give the tenant the contemplated possession of the premises so as to warrant a rent abatement.
We have rejected the contention that the extended lack of elevator service in itself entitled the tenant to avoid its obligations under the lease. Further, even if the long delay in the completion of the elevator work could have supported a claim for breach of the lease, such a claim was precluded by the tenant’s failure to comply with lease paragraph 46.02, which required it to send written notice of a claimed default in order to give the landlord the opportunity to cure. Because no such notice was served, the tenant is not entitled to relief based on a claim that the landlord was in default of the lease.
*177 A question remains as to whether the landlord is entitled to the relief it seeks on its counterclaims. Our rejection of the trial court’s findings of actual or constructive eviction does not necessarily entitle the landlord to the judgment it seeks for rent due through March 31, 2007, the broker’s fee reimbursement, and attorney’s fees. To be entitled to rent accruing after the tenant agreed to vacate the premises, the landlord must establish that it properly terminated the lease in accordance with its terms, in particular, by its December 18, 2006 notice demanding that the tenant vacate the premises by December 27, 2006, which the landlord now refers to as a “Conditional Limitation Notice,” although it was actually called a “Notice of Termination,” and which did not include the conditional notice containing a cure period required by lease paragraph 48.02. The trial court declined to reach the issue of whether defects in the notice would affect the landlord’s rights.
Because this issue and the question of entitlement to attorney’s fees, if any, were not addressed by the trial court, we remand the matter for further proceedings.
Accordingly, the judgment of the Supreme Court, New York County (Ira Gammerman, J.H.O.), entered September 4, 2008, after a nonjury trial, awarding plaintiff tenant the principal sum of $30,000, representing its security deposit and first month’s rent, and dismissing defendant’s counterclaims, should be reversed, on the law and the facts, without costs, the award vacated, defendant’s counterclaims reinstated, and the matter remanded for further proceedings consistent herewith.
Mazzarelli, J.E, Andrias, Catterson and Acosta, JJ., concur.
Judgment, Supreme Court, New York County, entered September 4, 2008, reversed, on the law and the facts, without costs, the award vacated, defendant’s counterclaims reinstated, and the matter remanded for further proceedings consistent herewith.